UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN J. REZNIK,

Plaintiff,

vs.

BANK OF AMERICA

Defendant.

_______________________________/

Case No. 4:26-cv-10514-SDK-KGA

Hon. Shalina D. Kumar

**STEVEN J. REZNIK'S FIRST AMENDED COMPLAINT PURSUANT TO [ECF 12]**

NOW COMES the Plaintiff, Steven J. Reznik, by and through Plaintiff's attorney, Phillip A. Greenblatt, PLLC, and for Plaintiff's First Amended Complaint Pursuant to [ECF 12], states as follows:

**General Allegations**

1. Defendant, BANK OF AMERICA ("Bank") is a financial institution that conducts business and maintains offices in Oakland County, Michigan where Plaintiff's banks accounts were opened.

2. That Plaintiff, Steven J. Reznik ("Victim"), holder of accounts established at Bank lives in Oakland County, Michigan. (Exhibit 1 – Deposit Account

Agreement and Disclosures ("DAA")) (ECF No. 1-1, PageID.33 Filed 02/13/26 PageID.33-69).

3. On February 13, 2026, by reason of Bank's removal of this matter had thereby submitted the parties and this matter to the Court's subject matter jurisdiction (ECF No. 1, PageID.1 Filed 02/13/26 PageID.1-9 of 9).

4. Plaintiff's First Amended Complaint pursuant to the parties STIPULATED ORDER FOR LEAVE TO FILE AN AMENDED COMPLAINT IN LIEU OF A RESPONSE TO THE MOTION TO DISMISS [ECF 12] seeks monetary damages in enforcing contractual obligations set forth in Bank's DAA effective 05/16/2025 in which Bank elected to impose upon itself additional duties and obligations exceeding the existing state of the law concerning depositor obligations concerning fraud and depositor voluntary authorization by agreeing to a heightened level of safeguards and internal fraud-prevention procedures in its deposit agreement to protect the depositor in an environment commonly known to experience an increasingly high number and level of sophisticated money fraud schemes.

## Specific Allegations

5. Plaintiff incorporates by reference and adopts as if fully set forth herein allegation Nos. 1 through 4 of the Plaintiff's Complaint.

6. The Plaintiff's Complaint sets forth material facts consisting far more than ordinary banking transactions.

7. Specifically, that within approximately a four-day business period between January 13, 2025 through January 16, 2025 Victim depleted nearly the entirety of his life savings through a series of unusually large withdrawals that were entirely inconsistent with his prior banking history.

8. Additionally, that Bank's employees personally participated in multiple teller-assisted withdrawals totaling $245,700.00, including a single transaction involving $112,000.00 during the four-day business period.

9. The transactions were far from routine consumer transactions because the withdrawals occurred in rapid succession and involved amounts that would reasonably be expected to trigger heightened Bank scrutiny and internal fraud-prevention procedures under its DAA.

10. Although the Victim authorized the transactions and the withdrawals were pursuant to his instructions and even if Bank did not know that fraud was occurring the Bank became liable for Victim's damages because the Bank in an environment plagued with skyrocketing levels of sophisticated bank fraud and increasing litigation of the subject matter contractually agreed to exceed the minimum legal standards and case decisions that ordinally protect a bank from

depositor authorizations regardless of a bank's knowledge of a fraud under the additional safeguards and internal fraud-prevention procedures the Bank imposed upon itself in its DAA dated 05/16/2025.

11. The dispute requires factual determination which is material to a determination in this matter concerning what Bank knew, what Bank employees observed, and whether Bank exercised reasonable care under extraordinary circumstances.

12. Whether Bank employees internally observed suspicious circumstances, generated fraud alerts, or otherwise that the transactions were flagged by Bank's internal monitoring systems, and possessed information regarding the recipient account are all factual and material matters uniquely within Bank's possession.

13. A factual determination in this matter is expected to demonstrate that Bank ignored extraordinary warning signs of an ongoing fraud scheme and failed to take reasonable steps available to it under its own DAA and internal fraud-prevention procedures including the identity of the perpetrator and banking institution for which the proceeds were transferred using the Banks ATM and Cashier's Check but Bank refused to retrieve the proceeds, criminally prosecute, or disclose the fraudster's identity.

14. Victim's banking transaction history within Bank's possession demonstrates a consistent and routine patten of deposits and occasional nominal withdrawals consistent with ordinary every day budgetary expenses establishing a course of conduct and predictability as a marker for identifying suspicious and/or fraudulent activity for internal hold placement to freeze account activity under the DAA.

15. Victim had a contractual understanding and expectation that Bank would perform under the DAA by employing operational protocols to flag, identify, warn, and protect Victim from unusual account activity inconsistent with past transaction history as a marker of perceived fraudulent activity as contractually bound under the heightened DAA obligations that the Bank imposed upon itself.

16. Victim's banking transaction history within Bank's possession established that victim never accessed a single large-scale withdrawal from his bank accounts prior to a rapid succession of consecutive large-scale withdrawals without any employing any of the cautionary safeguards by Bank under the DAA to pause the activity to ensure the absence of fraudulent activity in approving Victim's instructions for the highly unusual activity.

17. Victim was fraudulently contacted by an individual named "Albert" claiming to be a Bank fraud department official representing that Victim's bank

accounts were the subject of an "internal investigation" and demanded that Victim withdraw his account funds and transfer the funds to the perpetrator for safe keeping until such time as the investigation could be concluded in order to place the funds back into his accounts.

18. During a four-day business period from January 13, 2025 through January 16, 2025, Victim initiated "teller assisted" cash withdrawals of $30,000.00 and $45,000.00 along with issuance of cashier checks for $112,000.00 and $58,700.00 for a never before four-day business period account cash withdrawals of $245,700.00 and in turn immediately transferred funds to fraud perpetrator facilitated by Bank's ATM machines and Bank tellers no question asked assistance without voluntarily closing account. (Exhibit 2 – Bank Account Holder Statement for Period January 8, 2025 through February 4, 2025)(ECF No. 1-1, PageID.71 Filed 02/13/26 PageID.71-73).

19. On January 13, 2025, Victim initiated a "teller assisted" cash withdrawal of $30,000.00 and transferred funds to fraud perpetrator recipient through Bank's ATM. (See Exhibit 2 – Bank Account Holder Statement for Period January 8, 2025 to February 4, 2025) )(ECF No. 1-1, PageID.72 Filed 02/13/26 PageID.71-73).

20. On January 14, 2025, Victim initiated a "teller assisted" cashier's check withdrawal of $112,000.00. (See Exhibit 2 – Bank Account Holder Statement for

Period January 8, 2025 to February 4, 2025) )(ECF No. 1-1, PageID.72 Filed 02/13/26 PageID.71-73).

21. On January 16, 2025, Victim initiated a "teller assisted" cashier's check withdrawal of $58,700.00. (See Exhibit 2 – Bank Account Holder Statement for Period January 8, 2025 to February 4, 2025) )(ECF No. 1-1, PageID.72 Filed 02/13/26 PageID.71-73).

22. On January 16, 2025, Victim initiated a "teller assisted" cash withdrawal of $45,000.00 and transferred funds to fraud perpetrator recipient through Bank's ATM. (See Exhibit 2 – Bank Account Holder Statement for Period January 8, 2025 to February 4, 2025) )(ECF No. 1-1, PageID.72 Filed 02/13/26 PageID.71-73).

23. Victim's account balance with Bank in a four-day business period was materially depleted for which Victim did not voluntarily close his account and Bank despite reasonable opportunity never questioned the suspicious activity to place a hold on the account and Bank employee even told Victim to "come back or go to another branch to obtain more cash since 'they were out.'"

24. After Victim performed the directed activity, he then received a call from Albert who began to laugh and stated that he was "scammed."

25. Victim has undertaken extraordinary efforts to cooperate and to bring the criminal perpetrator to justice including having timely filed a complaint with Bank on January 20, 2025, January 28, 2025 and March 4, 2025 along with submitted a Victims SCAM Victim Acknowledgment (See Fn 1) dated March 24, 2024, a Rebuttal Letter to Bank of America dated March 31, 2025 and on June 23, 2025. Bank had opened a series of internal claims including Claim Number 20JAN2025-985172, 28JAN2025-995606, and 04MAR2025-142981 but denied the claim multiple times including in written form on March 4, 2025 and on April 30, 2025. (Exhibit 3 – Claims, Document Submissions, and Bank Claim Denials)[1]. (ECF No. 1-1, PageID.74 Filed 02/13/26 PageID.74-83).

26. On January 20, 2025, Victim filed a police report with the City of Wixom, Officer A. Spring and Sargent Caldwell and identified as Report No. 25-1271. (Exhibit 4 – Filing of Police Report) (ECF No. 1-1, PageID.84 Filed 02/13/26 PageID.84-85).

[1] The irony of Banks's denial is that Bank admittedly provided "teller assistance" in each instance of fraud but failed to employ a safeguard to prevent or stop the fraudulent transactions then proceeded to whitewash its failure by requiring Victim to execute a "Bank drafted Scam Victim Acknowledgment" containing a series of statements shifting liability to Victim including Victim's waiver of Bank liability stating in part, "Bank complied with the Client's instructions to conduct the transactions" and Bank's "Recovery Effort is a voluntary accommodation and is not an admission of any liability by the Bank" and then proceeded to deny Victim's claim with Bank stating, "By signing the Acknowledgment, you agreed that the transactions were authorized and understood that Bank made no guarantee of recovery." See, Exhibit 3 - SCAM Victim Acknowledgment dated March 25, 2025 and Bank denial letter dated April 30, 2025.

27. On January 28, 2025, Victim filed with the Federal Bureau of Investigation ("FBI") an Internet Crime Complaint ("IC3"). (Exhibit 5 – FBI, IC3 Complaint)(ECF No. 1-1, PageID.86 Filed 02/13/26 PageID.86-92).

28. On January 30, 2025, Victim filed a Federal Trade Commission ("FTC") complaint. (Exhibit 6 – FTC Complaint)(ECF No. 1-1, PageID.93 Filed 02/13/26 PageID.93-95).

29. Bank's March 4, 2025 letter states "we previously notified you that as a courtesy we would attempt to recover funds on your behalf. The attempt to recover the funds was not successful. We now consider this inquiry closed." (See Exhibit 3 – Claims, Document Submissions, and Bank Claim Denials) (ECF No. 1-1, PageID.75 Filed 02/13/26 PageID.74-83).

30. Bank then changed its position on March 24, 2025 stating, "You informed us 03/04/2025 that you transferred the funds from your account(s) at Bank of America to a third party as a result of a scam. We would like to help you recover the funds your transferred." The Bank further stated, "Because Bank of America could incur liability to third parties by attempting to recover funds on your behalf, we ask that you return the enclosed Scam Victim Acknowledgment." The Bank also stated, "We understand the funds were transferred to another account at Bank of America. We'll place a hold right away on remaining balance

of the transferred funds. We don't need the signed Scam Victim Acknowledgment before placing the hold – We'll do that before we receive it." (See Exhibit 3 – Claims, Document Submissions, and Bank Claim Denials) (ECF No. 1-1, PageID.76 Filed 02/13/26 PageID.74-83).

31. The Bank's position evolved a third time with its letter dated March 27, 2025 stating, "STEVEN, we had some success in recovering your funds. We received $170,700.00 and have credited your account. We know consider your inquiry closed." (Exhibit 7 – Bank of America Letter Dated March 27, 2025)(ECF 13-1, Page 1).

32. The second page authored by Bank's Resolution Specialist for Regulatory Complaint, Gustavo Guardo, further states, "we successfully recovered $170,700.00 and applied it to your account ending in 3187. We know consider the above-mentioned claims resolved and closed. As such, we must respectfully decline your request for reimbursement of the cash withdrawals totaling $75,000.00." (See Exhibit 7 – Bank of America Letter Dated March 27, 2025)(ECF 13-1, Page 2).

33. The Banks shifting positions raises genuine issues of material fact going from "recovery efforts were unsuccessful" on March 4, 2025 to "We understand the funds were transferred to another account at Bank of America. We'll place a

hold right away on remaining balance of the transferred funds. We don't need the signed Scam Victim Acknowledgment before placing the hold" on March 24, 2025 to days later on March 27, 2025 stating, "we successfully recovered $170,700.00 and applied it to your account ending in 3187" after Victim signed the Bank's "SCAM Victim Acknowledgement" form.

34. None of the Bank's correspondences explain what changed between their March 4, 2025 to March 27, 2025 communications raising genuine issues of material fact as to a material inconsistency in the Bank's explanations.

35. Bank's position that the funds are not recoverable because the transactions were authorized and that the Bank was following the Victim's instructions is contradicted by the fact that the Bank recovered any funds.

36. Bank's recovery of any funds after initially stating that the "recovery efforts were unsuccessful" demonstrates that the Bank despite the Victim having authorized the transactions and the withdrawals were pursuant to his instructions, the Bank became liable for Victim's damages because the Bank contractually agreed to exceed the minimum legal standards and case decisions that ordinally protect a bank from depositor authorizations regardless of a bank's knowledge of a fraud under the additional safeguards and internal fraud-prevention procedures the Bank imposed upon itself in its DAA dated 05/16/2025 and/or by its conduct.

37. The Bank's position articulated on March 4, 2025 that, "We understand the funds were transferred to another account at Bank of America. We'll place a hold right away on remaining balance of the transferred funds. We don't need the signed Scam Victim Acknowledgment before placing the hold" raises genuine issues of material fact as to when Bank despite earlier notice of Victim's position actually placed a "hold" on the funds.

38. When the Bank recovered funds raises raising genuine issues of material fact as to a material inconsistency in the Bank's explanations.

39. Whether the Bank recovered funds in advance of but not released until after the Victim signed the "Scam Victim Acknowledgment" form raises genuine issues of material fact of whether Bank's primary interest was protection of itself, Victim, or the account holder in which the funds were transferred.

40. Bank's position that it does not know or shall not disclose the identity of the criminal fraudster is contradicted by the fact that the Bank recovered any funds and raises genuine issues of material fact as to why the Bank is unable or unwilling to recover the remaining $75,000.00.

41. Bank's position that it does not know or shall not disclose the identity of the criminal fraudster for purposes with Victim's cooperation to prosecute the

criminal fraudster raises genuine issues of material fact as to why the Bank is unable or unwilling to do so.

42. Bank's position that there is a difference between a "Cashier's Check" and "Cash" is materially inconsistent with the fact that the Bank admittedly recovered and froze $15,000.00 in cash then inexplicably failed or refused to release the funds to the Victim raising genuine issues of material fact.

43. Between March 5, 2025 and March 21, 2025, Victim spoke to Tyler Keen, Bank's Vice President – Senior Internal Investigator and Internal Enterprise Investigations, Fraud & Abuse Investigations who stated to Victim that they, "know at least one of the scammers and want to ensure all law enforcement is involved to proceed" and asked that Victim contact his local police department which was done by Victim. (Exhibit 8 – Victim Email Chain From March 4, 2025 through March 21, 2025)(ECF 13-2, Pages 1-2).

44. Minimally, Bank officials in positions of power and authority including Tyler Keen, Bank's Vice President – Senior Internal Investigator and Internal Enterprise Investigations, Fraud & Abuse Investigations, and Kristin Murani, Officer-Client Advocate, C.A.R.E. (Client Advocacy & Resolution Experience) Team personally participated in and admittedly acknowledged that they, "know at least one of the scammers" and that they, "froze and were holding $15,000.00 in

cash." (Exhibit 9 – Victim Email Chain From March 21, 2025 through April 7, 2025)(ECF 13-3, Pages 1-4).

45. The communications and admissions materially undermines a position by the Bank that there is a distinction in its ability to recover funds whether in the form of a cashier's check or cash and regardless of the Victim's authorization and instructions and irrespective of the language of the DDA because the Bank either undertook contractually agreed to exceed the minimum legal standards and case decisions that ordinally protect a bank from depositor authorizations regardless of a bank's knowledge of a fraud under the additional safeguards and internal fraud-prevention procedures the Bank imposed upon itself in its DAA dated 05/16/2025 and/or by its conduct and performance.

46. Bank in declining Victims requests for records concerning the movement and recovery of funds between identified accounts, ATM's, institutions, dates, locations, and methodology rendering impossible for the Victim to adopt the Bank's position and raises genuine issues of material fact necessary to the resolution of this matter.

47. Bank had failed to perform its contractual duty under the DAA of ordinary and reasonable care to protect Victim.

48. Bank had failed to perform its contractual duty under the DAA of due diligence to protect Victim.

49. Bank's failure of performance of its contractual duty under the DAA to properly investigate has caused damages to Victim.

50. Bank's conduct is inconsistent with the Uniform Commercial Code causing damages to Victim.

51. The Electronic Funds Transfer Act ("EFTA") and Regulation E consist of duties characteristic of fraud-prevention and error-resolution obligations.

52. Here, the Bank's self-imposed heightened level of contractual obligations under its DAA are consistent with the Official Staff Commentary to Regulation E, within 12 C.F.R. § 1005.6(b) of the EFTA entitled "Liability of consumer for unauthorized transfers" specifically states, "Negligence by the consumer cannot be used as the basis for imposing greater liability than is permissible under Regulation E."

53. The Regulation further provides, "Thus, consumer behavior that may constitute negligence under state law, such as writing the PIN on a debit card or on a piece of paper kept with the card, does not affect the consumer's liability for unauthorized transfers."

54. The EFTA further imposes on Bank a duty to investigate unauthorized transfers and correct errors as set forth pursuant to 15 U.S.C. § 1693f or be subject to treble damages (e) and Regulation E § 1005.11 which requires Bank to follow enumerated Procedures for resolving errors.

55. These mandatorily enumerated investigative regulations along with Bank's DAA overcome pre-existing case law favoring a bank from disavowing liability and reimbursement because the consumer "voluntarily authorized" a transaction or was "careless, negligent, or tricked by a scammer."

56. Victim is afforded Additional federal banking protections under the Fair Credit Reporting Act ("FCRA") including under 12 C.F.R. § 334.90(d) entitled "Duties regarding the detection, prevention, and mitigation of identity theft" which affirmatively imposing *Identity-Theft* 12 C.F.R. § 334.90(d)(8) prevention and *Red Flag* 12 C.F.R. § 334.90(d)(9) programs with written policies and procedures concerning *"covered accounts"* primarily for personal, family, or household purposes including checking or savings accounts 12 C.F.R. § 334.90(d)(3)(i) for which Bank.

57. Here, the Bank's self-imposed heightened level of contractual obligations under its DAA are consistent with an understanding and expectation consistent with affirmative duties and obligations *Identity-Theft* 12 C.F.R. §

334.90(d)(8) prevention and *Red Flag* 12 C.F.R. § 334.90(d)(9) programs with written policies and procedures concerning *"covered accounts"* primarily for personal, family, or household purposes including checking or savings accounts 12 C.F.R. § 334.90(d)(3)(i) for which Bank agreed to protect the depositor in an environment known to experience an increasingly high number and level of sophisticated money fraud schemes regardless of depositor authorization or Bank's knowledge of fraud.

58. Federal law provides pursuant to 15 U.S. Code § 1693l - Waiver of rights, that:

> No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter. Nothing in this section prohibits, however, any writing or other agreement which grants to a consumer a more extensive right or remedy or greater protection than contained in this subchapter or a waiver given in settlement of a dispute or action.

(Pub. L. 90–321, title IX, § 914, as added Pub. L. 95–630, title XX, § 2001, Nov. 10, 1978, 92 Stat. 3737.)

59. Bank has failed to honor its contractual obligations under the DAA causing damages to Victim.

60. Bank has failed to adhere to enumerated obligations under the EFTA causing damages to Victim.

61. Despite Victim's diligent efforts to assist bank in pursuing the perpetrator, Bank has refused to render Victim whole as a victim of the unlawful conduct.

62. Bank refuses to recover Bank Victim's outstanding funds totaling $75,000.00 despite admittedly knowing the identity of the criminal perpetrator of the fraud perhaps because the Bank identified the criminal perpetrator because of the transfer through Bank's ATM Machines but regardless of the basis of its discovery refuses to disclose the identity and location, or prosecute the criminal fraudster account holder known by Bank to have used the instrumentalities of the Bank in perpetrating a felonious financial crime which is material to the resolution of this matter.

## **COUNT I**

## **BREACH OF CONTRACT**

63. Plaintiff incorporates by reference and adopts as if fully set forth herein the allegations set forth in Paragraph Nos. 1-62 of the Plaintiff's First Amended Complaint.

64. Bank offered Victim to enter into a "Deposit Account Agreement ('DAA')" for a personal bank account. (See Exhibit 1 – Deposit Account

Agreement and Disclosures ("DAA")) (ECF No. 1-1, PageID.33 Filed 02/13/26 PageID.33-69).

65. Bank's DAA included a provision concerning "Processing and Posting Orders ('PPO')" stating that "Posting transactions to your account impacts your account balance. . . . Holds include authorization holds for transactions we have authorized, but not yet posted to your account, such as for debit card transactions, cash withdrawals at an ATM or financial center. Debits include withdrawals, transfers, payments, checks, non-recurring and recurring debit card transactions. . . . you agree that we may credit, authorize, accept, pay, decline, or return credits, debits, and holds in any order at our option." Posting Orders include" "Non-recurring and recurring debit card transactions; withdrawals made at our tellers and ATM's; one-time transfers made at ATM's, through our tellers, by telephone, and through Online and Mobile Banking; checks that you wrote and cashed by our tellers; and, wire transfers." (See Exhibit 1 – Deposit Account Agreement and Disclosures ("DAA")) (ECF No. 1-1, PageID.47 Filed 02/13/26).

66. Bank's DAA included a provision in the DAA concerning "Large Cash Withdrawals ('LCW')" stating that "We may also refuse to honor a request to withdraw funds in cash from your account at a financial center if we believe that the amount is unreasonably high or that honoring the request would cause us an

undue hardship." (See Exhibit 1 – Deposit Account Agreement and Disclosures ("DAA")) (ECF No. 1-1, PageID.53 Filed 02/13/26).

67. Bank's DAA included a provision in the DAA concerning "General Liability" stating that "We are responsible for exercising ordinary care and complying with this Agreement. Any provision of this agreement that limits our liability does not change our duty to act in good faith and with ordinary care." (See Exhibit 1 – Deposit Account Agreement and Disclosures ("DAA")) (ECF No. 1-1, PageID.60 Filed 02/13/26).

68. That Plaintiff accepted Defendant's offer.

69. That in consideration of the mutual execution of the Contract, Plaintiff to its detriment performed as agreed with respect to payment and for which Defendant benefitted by Plaintiff's performance.

70. Although the Victim authorized the transactions and even if Bank did not know that fraud was occurring the Bank became liable for Victim's damages because the Bank contractually agreed to exceed the minimum legal standards and case decisions that ordinally protect a bank from depositor authorizations regardless of a bank's knowledge of a fraud under the additional safeguards and internal fraud-prevention procedures the Bank imposed upon itself in its DAA and/or through performance and conduct.

71. That Defendant failed to honor the terms and conditions of the

agreement triggering a default and breach of contract.

72. The dispute requires factual determination which is material to determination in this matter concerning what Bank knew, what Bank employees observed, and whether Bank exercised reasonable care under extraordinary circumstances.

73. Whether Bank employees internally observed suspicious circumstances, generated fraud alerts, or otherwise that the transactions were flagged by Bank's internal monitoring systems, and possessed information regarding the recipient account are all factual and material matters uniquely within Bank's possession.

74. A factual determination in this matter is expected to demonstrate that Bank ignored extraordinary warning signs of an ongoing fraud scheme and failed to take reasonable steps available to it under its own DAA and internal fraud-prevention procedures including the identity of the perpetrator and banking institution for which the proceeds were transferred but Bank refused to retrieve the proceeds, criminally prosecute, or disclose the fraudster's identity.

75. Victim's banking transaction history within Bank's possession demonstrates a consistent and routine patten of deposits and occasional nominal withdrawals consistent with ordinary every day budgetary expenses establishing a course of conduct and predictability as a marker for identifying suspicious and/or

fraudulent activity for internal hold placement to freeze account activity under the DAA.

76. Victim had a contractual understanding and expectation that Bank would perform under the DAA by employing operational protocols to flag, identify, warn, and protect Victim from unusual account activity inconsistent with past transaction history as a marker of perceived fraudulent activity as contractually bound under the heightened DAA obligations that the Bank imposed upon itself.

77. Victim's banking transaction history within Bank's possession established that victim never accessed a single large-scale withdrawal from his bank accounts prior to a rapid succession of consecutive large-scale withdrawals without any employing any of the cautionary safeguards by Bank under the DAA to pause the activity to ensure the absence of fraudulent activity in approving the highly unusual activity.

78. That Defendant's breach of contract for its respective non-performance is the direct and proximate cause of damages that the Plaintiff has in fact sustained in the amount of no less than $75,000.00 along with recoverable attorney fees and costs incurred as a result of the Defendant's breach and other wrongful conduct elaborated in the Plaintiff's Complaint.

## COUNT II

## BANK'S BREACH OF ORDINARY CARE, FAILURE TO INVESTIGATE, DUE DILIGENCE, GOOD FAITH AND FAIR DEALING, AND WARRANTY UNDER MICHIGAN'S UNIFORM COMMERCIAL CODE

79. Plaintiff incorporates by reference and adopts as if fully set forth herein the allegations set forth in Paragraph Nos. 1-78 of the Plaintiff's First Amended Complaint.

80. Michigan law under the Uniform Commercial Code provides obligations on Bank enumerated by statutory definitions pursuant to MCL 440.1201stating in relevant part:

> (q) "Fault" means a . . . breach, or wrongful act or omission.
>
> (t) "Good faith", . . . means honesty in fact and the observance of reasonable commercial standards of fair dealing.
>
> (ff) "Remedy" means any remedial right to which an aggrieved party is entitled with or without resort to a tribunal.
>
> (hh) "Right" includes remedy.

(Michigan Legislature, 2026).

81. Michigan law under the Uniform Commercial Code provides additional

enumerated statutory definitions pursuant to MCL 440.1202 in relevant part:

(a) Subject to subdivision (f), a person has "notice" of a fact if the person has any of the following:

*(i)* Actual knowledge of it.

(*ii*) Received a notice or notification of it.

(*iii*) From all the facts and circumstances known to the person at the time in question, reason to know that it exists.

(b) "Knowledge" means actual knowledge. "Knows" has a corresponding meaning.

(c) "Discover", "learn", or words of similar import refer to knowledge rather than to reason to know.
(d) A person "notifies" or "gives" a notice or notification to another person by taking those steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it.

(e) Subject to subdivision (f), a person "receives" a notice or notification when either of the following occurs:

(*i*) It comes to that person's attention.

(*ii*) It is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of those communications.

> (f) Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless the communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information.

(Michigan Legislature, 2026).

82. Michigan law under the Uniform Commercial Code provides certain enumerated statutory obligations pursuant to MCL 440.1202 stating:

> (1) Whether a time for taking an action required by this act is reasonable depends on the nature, purpose, and circumstances of the action.
>
> (2) An action is taken seasonably if it is taken at or within the time agreed or, if no time is agreed, at or within a reasonable time.

(Michigan Legislature, 2026).

83. Michigan law under the Uniform Commercial Code provides for treatment of a presumption pursuant to MCL 440.1206 stating:

> Whenever this act creates a "presumption" with respect to a fact, or provides that a fact is "presumed", the trier of fact must find the existence of the fact unless and until evidence is introduced that supports a finding of its nonexistence.

(Michigan Legislature, 2026).

84. Michigan law under the Uniform Commercial Code provides for treatment of Bank's obligations regardless of the existence of a written agreement stating pursuant to MCL 440.1302:

> (1) Except as otherwise provided in subsection (2) or elsewhere in this act, the effect of any provision of this act may be varied by agreement.
>
> (2) The obligations of good faith, diligence, reasonableness, and care prescribed by this act may not be disclaimed by agreement. The parties, by agreement, may determine the standards by which the performance of those obligations is to be measured if those standards are not manifestly unreasonable. Whenever this act
>
> requires an action to be taken within a reasonable time, a time that is not manifestly unreasonable may be fixed by agreement.
>
> (3) The presence in certain provisions of this act of the phrase "unless otherwise agreed", or words of similar import, does not imply that the effect of other provisions may not be varied by agreement under this section.

(Michigan Legislature, 2026).

85. Michigan law provides pursuant to MCL 440.4202 the following obligations imposed upon Bank:

> (1) A collecting bank must exercise ordinary care in all of the following:
>
> (a) Presenting an item or sending it for presentment.
>
> (b) Sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after

> learning that the item has not been paid or accepted, as the case may be.
>
> (c) Settling for an item when the bank receives final settlement.
>
> (c) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.
>
> (2) A collecting bank exercises ordinary care under subsection (1) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness.

(Michigan Legislature, 2026).

86. Also, pursuant to MCL 440.4207 Michigan law imposes a warranty on the Bank that:

> (1) A . . . collecting bank that transfers an item and receives a settlement or other consideration warrants to the transferee and to any subsequent collecting bank all of the following:
>
> (d) That the item is not subject to a defense or claim in recoupment under section 3305(1) of any party that can be asserted against the warrantor.

(Michigan Legislature, 2026).

87. MCL 440.3305 provides that:

(1) Except as otherwise provided in this section, the right to enforce the obligation of a party to pay an instrument is subject to the following:

(a) A defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings.

(Michigan Legislature, 2026).

88. MCL 440. 4214 provides in relevant part:

(4) The right to charge-back is not affected by either of the following:

(a) Previous use of a credit given for the item.

(b) Failure by any bank to exercise ordinary care with respect to the item, but a bank so failing remains liable.

(5) A failure to charge-back or claim refund does not affect other rights of the bank against the customer or any other party.

(6) If credit is given in dollars as the equivalent of the value of an item payable in a foreign money the dollar amount of any charge-back or refund shall be calculated on the basis of the bank-offered spot rate for the foreign money prevailing on the day when the person entitled to the charge-back or refund learns that it will not receive payment in ordinary course.

(Michigan Legislature, 2026).

89. Bank offered Victim to enter into a DAA for a personal bank account.

90. The materially relevant terms of the DAA are set forth in Victim's Count I Breach of Contract allegations supra.

91. That Victim accepted Bank's offer.

92. That in consideration of Victim's execution of the DAA, Victim to its detriment performed as agreed with respect to the DAA and for which Bank benefitted by Victim's performance.

93. Although the Victim authorized the transactions and even if Bank did not know that fraud was occurring the Bank became liable for Victim's damages because the Bank contractually agreed to exceed the minimum legal standards and case decisions that ordinally protect a bank from depositor authorizations regardless of a bank's knowledge of a fraud under the additional safeguards and internal fraud-prevention procedures the Bank imposed upon itself in its DAA.

94. Bank had a heightened contractual duty under the DAA and minimally of ordinary care pursuant to MCL 440.4202 owed to Victim account holder to protect against fraud including crimes committed against its account holders with account proceeds known by Bank to have been transferred using Bank's ATM to

the Bank's known criminal account holder, Bank refuses to prosecute despite knowing the identity of the criminal account holder recipient of the transferred funds, and Bank refuses to disclose the full identify and location of account holder known by Bank to have used the instrumentalities of the Bank in perpetrating a felonious financial crime.

95. Bank in transferring proceeds from its Victim account holder to Bank's fraud perpetrator account holder warranted pursuant to MCL 440.4207 that the items were not subject to a defense or claim in recoupment under section 3305(1) on behalf of Victim.

96. Bank contractually obligated itself to know or should have known that Victim had a defense pursuant to MCL 440.3305 against transfer of items and Bank recipient account holder perpetrating the fraud knew Bank had the right to recover of transferred items-based illegality of the transaction which, under other law, nullifies the obligation of the obligor, and/or fraud by perpetrator that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character.

97. Bank contractually obligated itself to know or should have known that fraud recipient was not a holder in due course because recipient committing the fraud did not take any instrument for value and in good faith pursuant to MCL

440.3302(b)(i) and (ii) respectfully because of the existence of Victims defense under MCL 440.3305(1).

98. Bank contractually obligated itself to know or should have known pursuant to MCL 440.3306 that its customer having secured proceeds from Bank's Victim through fraud took proceeds not as a holder in due course and therefore was subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds.

99. Bank contractually obligated itself to know or should have known that pursuant to MCL 440.4214 it had a right to charge-back its recipient account holder who committed a financial crime against Victim and refund the credit to the Bank's Victim account holder.

100. Bank has failed pursuant to MCL 440.202 to take proper action within reasonably longer time to constitute the exercise of ordinary care and satisfy its burden of establishing timeliness.

101. Bank had knowledge and notice of its account holder's crime against account holder Victim but despite ability has failed to exercise ordinary care to fully recover and refund Victim all illegally gained funds transferred to

perpetrator's Bank account and pursuant to MCL 440.4414 Bank remains liable for Victim's account holder's loss.

102. Michigan's Uniform Commercial Code states in relevant part pursuant to MCL 440.4301(1) that:

> The effect of the provisions of this article may be varied by agreement but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

(Michigan Legislature, 2026).

103. Bank failed to contractually and/or by reason of statute cannot disclaim its contractual responsibility owed to Victim for Bank's lack of good faith or Bank's failure to exercise ordinary care or limit the measure of Victim's damages for the lack or failure of Bank because Bank was placed on reasonable notice of the fraud and the Bank then identified that the perpetrator of the fraud using Bank's ATM, Bank refuses to prosecute despite knowing the identity of the criminal account holder recipient of the transferred funds, and Bank refuses to disclose the full identify and location of account holder known by Bank to have used the instrumentalities of the Bank using Bank's ATM in perpetrating a felonious financial crime.

104. Bank failed to exercise ordinary care to identify and place a hold or freeze to inquire or investigate the existence of highly unusual and suspicious banking activity in a highly condensed period of time which would allow a Bank official exercising ordinary care to determine the existence of fraud.

105. Bank knew or should have known simply by exercising reasonable care of the suspicious activity when Bank representative knew or should have known that the Victim had no prior history of engaging in large scale ATM cash withdrawals, inter-banking transfers using Bank ATM, or cashier check requests, and Bank refuses to prosecute despite knowing the identity of the criminal account holder recipient of the transferred funds, and Bank refuses to disclose the full identify and location of account holder known by Bank to have used the instrumentalities of the Bank in perpetrating a felonious financial crime.

106. The dispute requires factual determination which is material to determination in this matter concerning what Bank knew, what Bank employees observed, and whether Bank exercised reasonable care under extraordinary circumstances.

107. Whether Bank employees internally observed suspicious circumstances, generated fraud alerts, or otherwise that the transactions were flagged by Bank's

internal monitoring systems, and possessed information regarding the recipient account are all factual and material matters uniquely within Bank's possession.

108. A factual determination in this matter is expected to demonstrate that Bank ignored extraordinary warning signs of an ongoing fraud scheme and failed to take reasonable steps available to it under its own DAA and internal fraud-prevention procedures including the identity of the perpetrator and banking institution for which the proceeds were transferred but Bank refused to retrieve the proceeds, criminally prosecute, or disclose the fraudster's identity.

109. Victim's banking transaction history within Bank's possession demonstrates a consistent and routine patten of deposits and occasional nominal withdrawals consistent with ordinary every day budgetary expenses establishing a course of conduct and predictability as a marker for identifying suspicious and/or fraudulent activity for internal hold placement to freeze account activity under the DAA.

110. Victim had a contractual understanding and expectation that Bank would perform under the DAA by employing operational protocols to flag, identify, warn, and protect Victim from unusual account activity inconsistent with past transaction history as a marker of perceived fraudulent activity as

contractually bound under the heightened DAA obligations that the Bank imposed upon itself.

111. Victim's banking transaction history within Bank's possession established that victim never accessed a single large-scale withdrawal from his bank accounts prior to a rapid succession of consecutive large-scale withdrawals without any employing any of the cautionary safeguards by Bank under the DAA to pause the activity to ensure the absence of fraudulent activity in approving the highly unusual activity.

112. That Bank's breach of the DAA and of one or more statutory enumerations for its respective non-performance is the direct and proximate cause of damages that the Plaintiff has in fact sustained in the amount of $75,000.00 along with recoverable attorney fees and costs incurred as a result of the Defendant's breach and other wrongful conduct elaborated in the Plaintiff's First Amended Complaint.

**COUNT III**

**BREACH OF ELECTRONIC FUNDS TRANSFER ACT**

113. Plaintiff incorporates by reference and adopts as if fully set forth herein the allegations set forth in Paragraph Nos. 1-112 of the Plaintiff's First Amended Complaint.

114. The Electronic Fund Transfer Act ("EFTA") pursuant to 15 USC 1693 et seq. of 1978 and Regulation E of the Code of Federal Regulations ("CFR") § 1005.1(b) states:

> Purpose. This part carries out the purposes of the Electronic Fund Transfer Act, which establishes the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfer and remittance transfer services and of financial institutions or other persons that offer these services. The primary objective of the act and this part is the protection of individual consumers engaging in electronic fund transfers and remittance transfers.

(CFPB, 2026).

115. Pursuant to CFR § 1005.2(a)(1):

> (1) "Access device" means a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers.
>
> (2) An access device becomes an "accepted access device" when the consumer:
>
> (i) Requests and receives, or signs, or uses (or authorizes another to use) the access device to transfer money between accounts or to obtain money, property, or services;
>
> (ii) Requests validation of an access device issued on an unsolicited basis; or

(iii) Receives an access device in renewal of, or in substitution for, an accepted access device from either the financial institution that initially issued the device or a successor.

(b)(1) "Account" means a demand deposit (checking), savings, or other consumer asset account (other than an occasional or incidental credit balance in a credit plan) held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes.

(CFPB, 2026).

116. Pursuant to CFR § 1005.3(b)(1):

The term "electronic fund transfer" means any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. The term includes, but is not limited to:

(i) Point-of-sale transfers;

(ii) Automated teller machine transfers;

(iii) Direct deposits or withdrawals of funds;

(iv) Transfers initiated by telephone; and

(v) Transfers resulting from debit card transactions, whether or not initiated through an electronic terminal.

(CFPB, 2026).

117. Pursuant to CFR § 1005.6 (b):

(4) If the consumer's delay in notifying the financial institution was due to extenuating circumstances, the institution shall extend the times specified above to a reasonable period.

(5)(i) Notice to a financial institution is given when a consumer takes steps reasonably necessary to provide the institution with the pertinent information, whether or not a particular employee or agent of the institution actually receives the information.

(ii) The consumer may notify the institution in person, by telephone, or in writing.

(iii) Written notice is considered given at the time the consumer mails the notice or delivers it for transmission to the institution by any other usual means. Notice may be considered constructively given when the institution becomes aware of circumstances leading to the reasonable belief that an unauthorized transfer to or from the consumer's account has been or may be made.

(6) Liability under state law or agreement. If state law or an agreement between the consumer and the financial institution imposes less liability than is provided by this section, the consumer's liability shall not exceed the amount imposed under the state law or agreement.

(CFPB, 2026).

118. Under the EFTA, "there is no bright-line time limit within which consumers must report unauthorized EFTs." (71 Fed. Reg. 1638, 1653 (Jan. 10, 2006)).

119. Other factors may not be used as a basis to hold consumers liable. Regulation E expressly prohibits the following factors as the basis for imposing greater liability than is permissible under Regulation E: the consumer was negligent; an agreement between the consumer and the financial institution provides for greater liability; or the consumer is liable for a greater amount under state law. (Staff Commentaries 205.6(b)-2 and 205.6(b)-3).

120. That as provided in section 12 CFR 205.12 and related commentary, for transactions involving access devices that also function as credit cards, the liability and error resolution provisions of Regulation E apply rather than Regulation Z to the unauthorized use of a combined access device-credit card involving an EFT (for example, cash withdrawals at an ATM from a checking account).

121. Under 12 CFR § 1005.2(m) "Unauthorized electronic fund transfer" means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit with the Official interpretation of 2(m), an unauthorized EFT includes a transfer initiated by a person who obtained the access

device from the consumer through fraud or an EFT at an ATM is an unauthorized transfer if the consumer has been induced by force to initiate the transfer.

122. That in any event, the United States Court of Appeals for the Sixth Circuit held, "Financial institutions subject to the EFTA must reimburse their customers for unauthorized transactions regardless of fault, except in limited circumstances. 15 U.S.C. § 1693g" *Michigan First Credit Union* v. *T-Mobile USA, Inc*., No. 23-1952, U.S. Ct of App., 6th Cir., Pg. 2, Decided July 16, 2024 *Quoting, Merisier v. Bank of Am., N.A.*, 688 F.3d 1203, 1204 (11th Cir. 2012).

123. Congress, "passed the EFTA as Title XX of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, 92 Stat. 3641 (codified at 15 U.S.C. § 1693 *et seq.*), which added the EFTA as Title IX to the comprehensive financial regulatory reform package known as the Consumer Credit Protection Act, 15 U.S.C. §§ 1601–1692 (1976). The EFTA, as we have explained, "protects individual consumer rights by 'provid[ing] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.'" *Michigan First Credit Union*, No. 23-1952, U.S. Ct of App., 6th Cir., Pg. 5, *Quoting, Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 351 (6th Cir. 2008) (alteration in original) (quoting 15 U.S.C. § 1693(b)).

124. That, although the use of the term "participants" might suggest that Congress intended to also benefit financial institutions, Congress clarified that "[t]he primary objective of" the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b). And the legislative findings accompanying the EFTA indicate that Congress adopted the Act to regulate the conduct of financial institutions for the benefit of their consumers:

> Congress finds that the use of electronic systems to transfer funds provides the potential for substantial benefits *to consumers*. However, due to the unique characteristics of such systems, the application of existing consumer protection legislation is unclear, leaving the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined.

*Id.*at Pg. 5, § 1693(a) (emphasis added).

125. Other provisions in the EFTA bolster the conclusion that the purpose of the Act is to benefit consumers, even at the expense of financial institutions. The EFTA requires financial institutions to investigate and resolve consumer-reported unauthorized electronic fund transfers within a limited time frame. *Id.* § 1693f. And although consumers can be liable for unauthorized electronic fund transfers involving their accounts, the EFTA limits their liability and places the burden on financial institutions to prove consumer liability. *Id.* § 1693g(a)–(b).

126. That, "a consumer incurs no liability from an unauthorized electronic fund transfer." *Id.*at 6. § 1693g(e). The EFTA does, however, impose liability on

financial institutions for failing to make an authorized electronic fund transfer or failing to stop payment on "a preauthorized transfer from a consumer's account when instructed to do so." *Id.* § 1693h(a). The EFTA also mandates lengthy consumer disclosure requirements on financial institutions in several different areas, including preauthorized electronic fund transfers from consumer accounts along with electronic fund transfers initiated from electronic terminals. *See, e.g.*, *id.* §§ 1693c, 1693d, 1693e, 1693o-1. *Id.* at 6.

127. That, Most importantly, the EFTA creates a cause of action for consumers, not financial institutions. It allows suits against "any person who fails to comply with any provision" of the Act "with respect to any consumer." *Id.* § 1693m(a). This includes an ability for consumers to seek treble damages in some instances. *Id.* § 1693f(e). "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Tex. Indus.*, 451 U.S. at 639. Based on these provisions, "it cannot possibly be said that [financial institutions] are members of the class for whose especial benefit [the EFTA] was enacted." *Id.* at 6 *Citing, See Nw. Airlines*, 451 U.S. at 92.

128. Case law to the contrary is inapplicable in this case to serve as a waiver as to Bank's liability because the Bank knowing of the state of the law that would have allowed the Bank to limit its liability nonetheless contractually agreed to

exceed the minimum legal standards and case decisions that ordinally protect a bank from depositor authorizations regardless of a bank's knowledge of a fraud under the additional safeguards and internal fraud-prevention procedures the Bank imposed upon itself in its DAA.

129. Although the Victim authorized the transactions and even if Bank did not know that fraud was occurring the Bank became liable for Victim's damages because the Bank contractually agreed to exceed the minimum legal standards and case decisions that ordinally protect a bank from depositor authorizations regardless of a bank's knowledge of a fraud under the additional safeguards and internal fraud-prevention procedures the Bank imposed upon itself in its DAA.

130. Bank assumed a contractual obligation and a duty of care to protect Victim from fraud.

131. Bank cannot disclaim its duty of care owed under its contractual obligation and/or as statutorily enumerated under law to Victim for Bank's lack of good faith or Bank's failure to exercise ordinary care or limit the measure of Victim's damages for the lack or failure of Bank because Bank was placed on reasonable notice of the fraud and the Bank then identified that the perpetrator recipient of the proceeds transferred using Bank's ATM to the Bank's known criminal account holder, Bank refuses to prosecute despite knowing the identity of

the criminal account holder recipient of the transferred funds, and Bank refuses to disclose the full identify and location of account holder known by Bank to have used the instrumentalities of the Bank in perpetrating a felonious financial crime.

132. Bank failed to exercise its heightened contractual obligation and/or as statutorily enumerated under law of ordinary care to identify and place a hold or freeze to inquire or investigate the existence of highly unusual and suspicious banking activity in a highly condensed period of time which would allow a Bank official exercising ordinary care to determine the existence of fraud.

133. Bank had a contractual obligation to know or should have known simply by exercising reasonable care of the suspicious activity that the Victim had no prior history of engaging in large scale ATM cash withdrawals, inter-banking transfers using Bank ATM, or cashier check requests.

134. Bank refused to recover from the Bank's account holder who secured Victim's proceeds through fraud, refused to prosecute the perpetrator of the fraud despite knowing the identity and location of the individual, and refused to furnish to Victim the name and location of Bank's account holder that perpetrated the fraud.

135. Victim has sustained damages as a result of Bank's breach of duty and failure to voluntarily remedy Victim's losses.

## CONCLUSION

**WHEREFORE** the Plaintiff, Steven J. Resnik, prays for a finding and entry of an order granting the Plaintiff's the fullest extent of remedies available as set forth in each count of the Plaintiff's First Amended Complaint and for any additional relief the court deems appropriate and just under the circumstances of this matter including money damages, treble damages, costs, and attorney fees.

Respectfully submitted,

Dated: July 8, 2026

/s/Phillip A. Greenblatt (P54170)
PHILLIP A. GREENBLATT, PLLC
Phillip A. Greenblatt (P54170)
Attorney for Plaintiff
P.O. Box 4270
Southfield, MI 48037
(248) 227-7350
phil@phillipagreenblattpllc.com

**Certificate of Service**

I certify that on July 8, 2026, the above Plaintiff's First Amended Complaint was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

/s/ *Phillip A. Greenblatt (P54170)*

PHILLIP A. GREENBLATT (P54170)

Attorney for Plaintiff